UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| EMAD ESHAK and ISAAC, INC., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | 2:11 CV 101 PPS |
| v. ) | |
| ) | |
| MARATHON PETROLEUM CO, LLC, ) | |
| MARATHON PETROLEUM LP, ) | |
| WALGREEN CO., and ) | |
| GEENEN DEKOCK GROUP 1, IN, LLC, ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

Emad Eshak wanted to buy the gas station he leased from Marathon Petroleum Company, but the owner sold the property to someone else, and afterwards he and Marathon agreed to end their franchise relationship. Eshak now claims that Marathon violated the Petroleum Marketing Practices Act ("PMPA") and tortiously interfered with his right to buy the property. Before the Court is Marathon's Motion for Summary Judgment [DE 29], and Eshak's Motion for Partial Summary Judgment [DE 32]. For the following reasons, Marathons's motion is granted, and Eshak's motion is denied.

### Background

I'll start with the undisputed facts. Marathon leased property at 6003 Central Ave., in Portage, from Norma Slanger, the property owner. The lease gave Marathon a right of first refusal to purchase the property if Slanger received an offer to purchase the property. [DE 29-1, at 2.] Marathon subleased the property from 2003 through March 31, 2011 to Eshak to operate a gas station, renewing the sublease several times. [DE 30-1 through DE 30-8.] Importantly, none of the sublease agreements included a right of first refusal. In other words, Marathon did not

convey to Eshak the right of first refusal that it received from the owner of the property.

In 2009, Slanger sold the property, and Marathon chose not to exercise its right of first refusal. It did however reserve its right to continue the lease until it expired on July 13, 2011. [DE 30-9, at 2.] Eshak knew that the property was for sale, and before the sale he told one of the property owners that he wanted to buy it, but his efforts failed. [DE 1 ¶¶ 10, 11.] In October 2010, Marathon sent a renewal sublease to Eshak, which would have extended the lease beyond March 31, 2011. When it sent the renewal, Marathon asked Eshak to sign the renewal by December 21, 2010. [DE 30-10.] Eshak neither signed the sublease nor communicated any intention to Marathon that he intended to sign it. Instead, Marathon received a letter from Harold Collins, Eshak's counsel, on November 16, 2010. [DE 32-13.] In the letter, Collins acknowledged that Eshak received the proposed sublease, but complained that it was confusing and that Marathon never notified Eshak that the property was being sold, or that Marathon's underlying lease with the property owner included the right of first refusal. [*Id.*] Collins ended the letter by demanding payment for the money Eshak lost in his failed attempt to purchase the property. [*Id.*]

On December 15, 2010, Marathon reminded Eshak to renew the sublease, and stated that if he "elects not to renew his relationship with Marathon by declining the proposed Service Station Sub-Lease, that election will give rise to the non-renewal of the relationship as of March 31, 2011." [DE 30-11, at 2.] Once again, Eshak didn't respond. Then, on December 22, 2010, Marathon notified Eshak that the franchise would expire on March 31, 2011 because Eshak failed to renew the sublease. [DE 30-12.]

With the termination date looming and evidently believing that the best defense is a good

2

offense, Eshak brought this lawsuit on March 18, 2011– three days before the termination date. The Complaint alleges (1) improper notice of termination under the PMPA, and (2) conspiracy to intentionally interfere with Eshak's contractual relations with Marathon. [DE 1] Afterwards, on April 1, 2011, Marathon and Eshak agreed to a new sublease, to start on April 1, 2011 and expire July 12, 2011, the end date coinciding with the date that Marathon's underlying lease ended. [DE 30-13.] As part of the extension, Eshak reserved his right to continue to prosecute this lawsuit and assert a violation of the PMPA for Marathon's failure to assign it's right of first refusal or to notify Eshak of the sale of the premises.

At the same time that the parties extended the sublease, they also entered into a Mutual Cancellation Agreement ("MCA"), the obvious purpose of which was to comply with the PMPA. [DE 30-14.] Paragraph 2 of the agreement states the following:

> The franchise relationship (as that term is defined in the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 et seq. created by the Agreement or otherwise existing between MPC and CUSTOMER is terminated and of no further force or effect.

[*Id.*] And paragraph 4 of the MCA reads "This Mutual Cancellation Agreement is an 'agreement, in writing between the franchisor and the franchisee to terminate the franchise' for purposes of the PMPA, 15 U.S.C. § 2802(b)(2)(D)." [*Id.*]

Eshak asserts that the MCA was procured by duress and deceit and it is therefore unenforceable. He also claims that Marathon had a duty under the PMPA to convey to him the right of first refusal that it had with the owner of the property. Both parties now seek summary judgment.

**Discussion**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley & Sons, Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The non-moving party must then set forth specific facts showing there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). In resolving a motion for summary judgment, I must draw every reasonable inference from the record in the light most favorable to the non-moving party. *Haefling v. United Parcel Serv., Inc.,* 169 F.3d 494, 497 (7th Cir. 1999).

I'll address the PMPA claim first, then the state law claim. Congress passed the PMPA in 1978 in response to the "widespread concern over increasing numbers of allegedly unfair franchise terminations and nonrenewals in the petroleum industry." *Mac's Shell Oil Serv., Inc. v. Shell Oil Prods.*, 130 S. Ct. 1251, 1254 (2010). The purpose of the PMPA is to "protect 'franchisees from arbitrary or discriminatory termination or non-renewal of their franchises.'" *Branch v. Amoco Oil Co.*, 677 F.2d 1213, 1216 (7th cir. 1982) (quoting S. Rep. No. 95-731, 95th Cong., 2d Sess. 15, *reprinted in* (1978) U.S.C. Cong. & Ad.News 873, 874).

The PMPA protects franchisees by limiting the circumstances wherein the franchisor may

terminate or nonrenew the franchise relationship. It provides a list of several grounds for termination. If any of those grounds exist and proper notification is provided, termination or nonrenewal is valid. If a franchisor fails to comply with the PMPA's restrictions on terminations and nonrenewals, a franchisee may bring suit in federal court. 15 U.S.C. § 2805(b)(d).

Section 2802 of the PMPA covers terminations and nonrenewals. Section 2802(a) states that a franchisor cannot terminate or non-renew any franchise relationship except as provided in subsection (b) of that section. Section 2802(b) provides various grounds under which a franchisor may terminate or nonrenew the franchise relationship. Section 2802(b)(2) covers grounds for either termination or nonrenewal, and section 2802(b)(3) covers grounds only for nonrenewal. Finally, subsection (c) defines circumstances where grounds for nonrenewal arise. Eshak's claim focuses on sections 2802(b)(2) and 2802(b)(3).

In 2010, the Supreme Court examined the breadth of this statutory framework in *Mac's Shell Oil Serv., Inc. v. Shell Oil Prods*. 130 S. Ct. at 1254-55. Shell Oil Company had franchise relationships with several Shell franchisees in Massachusetts. One common term among those franchise agreements was a rent subsidy that Shell renewed annually but had the option to cancel with thirty days' notice. *Id.* at 1256. When Shell joined two oil companies to create a joint venture combining the three companies' petroleum marketing operations, Shell assigned all of its rights and obligations under the franchise agreements. Thereafter, the joint venture did not offer its franchisees the same rental terms, and the franchisees brought claims under the PMPA. *Id.* The franchisees argued that constructive termination and nonrenewal occurred in violation of the PMPA, but the Supreme Court disagreed.

In rejecting the franchisees' PMPA claims, the Court noted that the PMPA is quite

narrow in scope; only federalizing the circumstances in which a franchisor may terminate or nonrenew the franchise relationship. *Id.* at 1259. The Court was unwilling to extend the PMPA to instances where the franchisees allege a breach of contract claim but the franchise relationship hasn't ended. *Id.* Additionally – and relevant to the main issue here – the Court addressed whether a franchisee who signed a renewal agreement can maintain a claim under the PMPA for improper nonrenewal. The Court said no, reasoning that "signing a renewal agreement negates the very possibility of a violation of the PMPA." *Id.* at 1263. The corollary to this point is that if a franchisee voluntarily signs a nonrenewal agreement, the PMPA is no longer implicated.

The dispute here doesn't involve an ongoing franchise relationship; the parties don't dispute that the relationship is over. What the parties disagree on is whether the franchise relationship ended in compliance with the PMPA. And the undisputed facts show that the MCA fits squarely into a ground for nonrenewal of the franchise relationship under the PMPA.[1] Specifically, 15 U.S.C. § 2802(b)(2)(D) permits nonrenewal or termination of a franchise relationship under these circumstances:

---

[1] Marathon also references 15 U.S.C. § 2802(b)(c) as a ground for its nonrenewal. Under this subsection, nonrenewal is permissible when:
> The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence--
> (i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or
> (ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

Marathon contended in its briefing that it provided notice of nonrenewal in the December 22, 2010 letter to Eshak stating that his failure to agree with the terms of the renewal were grounds for nonrenewal [DE 30-12.] However, during the hearing, Marathon clarified that it was relying on the MCA as its ground for nonrenewal, not the December notification. Although the letter's terms are quite clear, because I've concluded the MCA is a valid end to the franchise relationship, I won't examine the meaning of this communication under the PMPA.

(D) An agreement, in writing, between the franchisor and the franchisee to terminate the franchise or not renew the franchise relationship, if –

(I) such agreement is entered into not more than 180 days prior to the date of such termination or, in the case of nonrenewal, not more than 180 days prior to the conclusion of the term, or the expiration date, stated in the franchise;

(ii) the franchisee is promptly provided with a copy of such agreement, together with the summary statement described in section 2804 (d) of this title; and

(iii) within 7 days after the date on which the franchisee is provided a copy of such agreement, the franchisee has not posted by certified mail a written notice to the franchisor repudiating such agreement.

The Mutual Cancellation Agreement entered into between Marathon and Eshak meets the requirements for termination. Eshak and Marathon both signed it on April 1, 2011, within 180 days of the July 12, 2011 termination date, and it's an agreement in writing between the franchisor and franchisee to terminate the franchise relationship. [DE 30-14.] This should end the inquiry, as a nonrenewal is valid if it meets any one ground under the PMPA. *See* 15 U.S.C. § 2802(b)(1)(B) (nonrenewal is valid if it's based on "a ground" listed in 2802(b)(2)); *Rowe v. Amoco Oil Co.*, 1983 WL 162179 (6th Cir. Nov. 8, 1983) ("Section 2802(b)(2)(D) provides an independent basis for termination of a franchise; the termination grounds listed under 28 U.S.C. § 2802(b)(2) are alternative ones.").

Eshak disagrees that the MCA is a valid ground for nonrenewal, and he presents a laundry-list of vague arguments in support of that proposition, but in essence they can be boiled down to two complaints: (1) the MCA isn't valid because it was procured by deceit; and (2) Marathon violated the PMPA in failing to offer him the right of first refusal. Neither argument is persuasive.

First, the undisputed facts show that the MCA is valid. Eshak attacks the MCA on the ground that it was entered into under duress and as a result of Marathon's deceit. The problem is

7

that Eshak submits no facts in support of these claims. Instead, he makes conclusory statements that he signed the MCA under duress because the litigation was already underway (litigation, by the way, that he instituted) and he would have been kicked off the property if he didn't sign it. [DE 33, at 5.]

The same is true of Eshak's deceit claim. He cites the Addendum to the sublease, which states the following:

> As of the date of this Agreement, [Marathon] does not have an option to extend the underlying lease or an option to purchase the real estate underlying the Premises. Should the underlying lease terminate, or not be renewed, [Marathon] shall have the right to terminate or nonrenew this Lease.

[DE 30-13, at 9.] I see no deceit in this part of the sublease, and in any event I fail to see what connection it has to the MCA. The first sentence regarding an option to purchase isn't deceitful at all because Marathon's underlying lease did not contain an option to extend or purchase the property. A right of first refusal and an option to purchase are distinct rights, so Marathon's statement was true even though the underlying lease did contain a right of first refusal. As for the second sentence, it merely governs Marathon's obligation if the underlying lease terminated. There is nothing deceitful about it. Eshak hasn't otherwise submitted facts related to duress or misrepresentations by Marathon, so the MCA is valid basis for nonrenewal of the franchise agreement.

As to his claim that the MCA somehow violated the PMPA, Eshak points to paragraph 15 of the renewal sublease, which states the following:

> LESSEE expressly reserves its right to assert and does not waive its claim set forth against MPC in the Complaint filed in the United States District Court for the Northern District of Indiana, Case No. 2:11-cv-00101 (the "Lawsuit") with respect to the alleged violation of the Petroleum Marketing Practices Act ("PMPA") for

8

> purported failure of MPC to assign any right of first refusal that MPC may have had with respect to the Premises and/or to notify LESSEE of the sale of the Premises. The Lawsuit and remaining claims therein against MPC are expressly disputed by MPC and liability is expressly denied by MPC; this limited reservation of right by LESSEE shall not be construed as an admission of liability by MPC and/or MPC's assent or agreement of viability of any claim asserted in the Lawsuit, but rather an agreement by the parties to compromise a disputed element of the Lawsuit.

[DE 30-13, at 7.] Eshak erroneously contends that this language supports the validity of his PMPA claim. This is rather curious. Although this section states that Eshak didn't give up his claims under the PMPA, it certainly doesn't state that Eshak's PMPA claim prevails. Rather, as Marathon explained at the oral argument, this paragraph merely shows that at the time the parties signed the MCA, they were disputing whether Eshak had such a claim. This language simply acknowledges that fact and preserves both parties' arguments under the PMPA.

Eshak next argues that even if the MCA is valid, the PMPA actually required Marathon to give Eshak its right of first refusal when the property went up for sale. He posits that Marathon needed to give him that right pursuant to section 2802(b)(3)(D)(iii)(II). Under this subsection, nonrenewal is permissible where the franchisor determines in good faith and in the normal course of business to nonrenew:

> [I]n the case of leased marketing premises such franchisor, during the 90-day period after notification was given pursuant to section 2802 of this title. . . if applicable, offered the franchisee a right of first refusal of at least 45-days duration of an offer, made by another, to purchase such franchisor's interest in such premises.

Section 2802(b)(3)(D)(iii)(II) doesn't apply here because Marathon wasn't selling its ownership interest in the property. This section of the PMPA kicks in when a franchisor owns the property and receives an offer to purchase it. Here, Marathon did not own the property; it leased the property from Slanger. Slanger had the ownership interest, and she received the

purchase offer from a third party. It's true that Marathon had a right of first refusal pursuant to its lease, but it chose to waive it. [DE 30-9, at 2.] Eshak provides no authority for the proposition that a franchisee somehow steps into the franchisor's shoes and receives its right of first refusal. The only case he points to involves a situation where a franchisor owns the property and fails to give the franchisee the right of first refusal when it sells the property. *See Grevo v. Mobil Oil Corp.*, 597 F. Supp. 468, 470 (N.D. Ill. 1984). Section 2802(b)(3)(D)(iii)(II) may govern in that circumstance. But under a plain reading of the statute, where the franchisor is itself leasing the property, this section is not applicable.

To summarize: the undisputed facts show that Marathon and Eshak agreed to end the franchise relationship, and the MCA is the document that memorialized that agreement. The MCA is an agreement in writing, and it's signed by both parties within 180 days of the nonrenewal. This makes it a valid ground for nonrenewal under the PMPA. *See* 15 U.S.C. § 2802(b)(2)(D).

Moving next to Eshak's state claim of tortious interference. It also is a loser. Eshak's Complaint alleges that the Defendants "conspired with each other and intentionally interfered with Plaintiffs' Contractual Relations with [Marathon] and Plaintiffs' Opportunity to Purchase the Service Station Property." He appears to allege a conspiracy to tortiously interfere with a contract and a conspiracy to tortiously interfere with a business opportunity.

First, under Indiana law "civil conspiracy is a combination of two or more persons who engage in a concerted action to accomplish an unlawful purpose or to accomplish some lawful purpose by unlawful means." *K.M.K. v. A.K.*, 908 N.E.2d 658, 663 (Ind. Ct. App. 2009). But to state a claim for civil conspiracy, there must be an underlying tort, and Eshak doesn't have one.

As to the interference with contract claim, the elements are (1) a valid and enforceable contract; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of breach of contract; (4) no justification; and (5) damages resulting from defendants' wrongful inducement of the breach. *Williams v. Seniff*, 342 F.3d 774, 792 (7th Cir. 2003). A party cannot tortiously interfere with its own contract. *McClain v. TP Orthodontics*, 2009 WL 2381915, at *7 (N.D. Ind. July 30, 2009); *Trail v. Boys and Girls Clubs of Northwest Indiana*, 845 N.E.2d 130, 138 (Ind. 2006) ("A party cannot 'interfere' with its own contracts, so the tort itself can be committed only by a third party.") Eshak essentially contends that Marathon conspired with the ultimate purchaser of the property to tortiously interfere with a contract that it was a party to – the sublease agreement with Eshak. But as I just noted, Marathon can't tortiously interfere with its own contract. So this claim can't get beyond first base.

Nor did Eshak have a valid business expectation that he could buy the property. The elements of tortious interference with a business opportunity are "the same as the elements for interference with a contract except there is no requirement that a valid contract exist," and an additional element that the defendant acted illegally. *Furno, D.C. v. Citizens Ins. Co. of America*, 590 N.E.2d 1137, 1140 (Ind. Ct. App. 1992). The original lease between Marathon and the property owner contained the right of first refusal. Eshak claims he had a "legally recognizable business expectancy that he could buy the property." However, he provides no facts that he ever had such an interest other than his unsupported assertions that he informed Marathon representatives that he would like to buy the property. [DE 32, at 3-4.] But even if he had such a valid business interest in buying the property, there are no facts–alleged or proven–that show that Marathon acted illegally with respect to Eshak's interest in purchasing the

11

property. So both of the tortious interference claims must fail.

For the foregoing reasons, Marathon's Motion for Summary Judgment is **GRANTED**, and Eshak's Motion for Partial Summary Judgment is **DENIED**.

**SO ORDERED.**

ENTERED: February 8, 2012

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
